**MORTGAGE INVESTORS CORPORATION OF OHIO, Petitioner,**

v.

**Hershel W. GOBER, Acting Secretary of Veterans Affairs, Respondent.**

**No. 99–7109.**

United States Court of Appeals, Federal Circuit.

Aug. 11, 2000.

**1376**

Steven C. Dupre', Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., of St. Petersburg, Florida, argued for petitioner. With him on the brief was Jill H. Bowman.

Gerald M. Alexander, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC,

argued for respondent. With him on the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director.

Before NEWMAN, RADER, and LINN, Circuit Judges.

RADER, Circuit Judge.

Mortgage Investors Corporation of Ohio (MIC), a private corporation which specializes in refinancing government-secured Federal Housing Administration (FHA) or Veterans Administration {VA} loans, petitions this court for direct review of a modification of a Department of Veterans Affairs (DVA) rule, *Loan Guaranty: Requirements for Interest Rate Reduction Refinancing Loans*, RIN 2900–A192, 64 Fed.Reg. 19906 et seq., (Apr. 23, 1999). This court has original subject matter jurisdiction to review this rule under 38 U.S.C. § 502 (1994). The rule governs some aspects of DVA's Interest Rate Reduction Refinancing Loan (IRRRL) Program, 38 U.S.C. § 3710 (1994). MIC challenges the new rule's sufficiency under the Administrative Procedure Act (APA), 5 U.S.C. § 553 (1994). This court finds the new rule to be neither arbitrary nor capricious, and DVA to have followed the APA's procedural requirements.

I.

Under 38 U.S.C. § 3703 (1994), DVA can guarantee a percentage of a veteran's private mortgage loan. The IRRRL program continues that guarantee when the veteran refinances the loan to obtain a lower interest rate. Before the rule change, no DVA review or approval was required for refinancing if the original loan was not more than three monthly payments past due.

On October 8, 1997, DVA announced a change in the three-payment rule by publishing an "interim final rule." The "interim final rule" stated that DVA approval was not required for an IRRRL refinancing if the loan was "current," i.e., not

"delinquent." Further, except in certain circumstances, the rule required that the refinancing had to reduce the veteran's new loan payment. The "interim final rule" did not define the terms "current" and "delinquent." Nonetheless, the rule made clear that the veteran could not skip any monthly loan payments before the refinancing, and effectively converted the three-payment grace period into a one-payment grace period.

DVA sought to change the rule because "a small number of lenders ha[d] been urging veterans to apply for loans under conditions that increase[d] the risk of loss to both the veteran and the Government." 62 Fed.Reg. 52503 (Oct. 8, 1997). DVA asserted that in some cases refinancers had added "exorbitant costs" to loans, while the borrowers benefited by only a very small interest rate reduction. *See id.* at 52503–04. DVA determined that lenders had encouraged veterans to skip payments on the old loan and use the savings to pay the costs of the new loan, or for some other purpose. *See id.* As a result of these practices, some veterans had experienced an increase in their monthly payment notwithstanding the new loan's lower interest rate. *See id.*

As published, the new rule was to be effective upon publication, but DVA solicited public comment until December 8, 1997. MIC filed a petition for judicial review and injunctive relief in this court on November 20, 1997. DVA rescinded the interim final rule on December 1, 1997, making MIC's petition moot.

On June 3, 1998, DVA published a "proposed rule," which was similar to its earlier interim final rule. Again the proposed new rule reduced the three-month grace period to one month. This proposed rule set no effective date and solicited comments from interested parties until August 3, 1998. DVA also noted that it would take account of comments it had already received on the interim final rule in its consideration of the new proposed rule. This proposed rule defined a "delinquent" loan as any loan whose scheduled monthly payment was more than thirty days past due. *See* 63 Fed.Reg. 30163 (June 3, 1998).

On April 23, 1999, DVA published a "final rule," with an effective date of May 24, 1999, in the Federal Register. In this publication, DVA discussed at length the public comments and alternative proposals it had received. *See* 64 Fed.Reg. 19906–09 (April 23, 1999). For technical reasons, DVA delayed the final rule's effective date until June 7, 1999. In May 1999, MIC filed a petition in this court requesting a stay, pending review, of the interim final rule, partially on the ground that DVA had not complied with the APA. MIC's petition was denied. *See Mortgage Investors Corp. of Ohio v. West,* 220 F.3d 1375 (Fed.Cir. 1999).

In the petition that is the subject of this appeal, MIC argues that DVA violated the APA. Specifically, MIC charges that the final rule is arbitrary and capricious. Further, MIC complains of procedural illegalities, asserting that the DVA did not provide a fair opportunity for public comment before adoption of the rule, did not provide an opportunity for the public to obtain and refute certain materials that "served as the impetus of the rule," was not genuinely responsive to the public comments, and kept no accurate record of the rule-making process.

## II.

This court's authority to review the proposed rule derives from 38 U.S.C. § 502 (1994): "An action of the Secretary [of Veterans Affairs] to which § 552(a)(1) or 553 ['rulemaking'] of title 5 (or both) refers ... is subject to judicial review ... in the United States Court of Appeals for the Federal Circuit." Thus, this court "may directly review rules promulgated by [DVA], including substantive rules of general applicability, statements of general policy and interpretations of general applicability." *LeFevre v. Secretary, Department of Veterans Affairs,* 66 F.3d 1191, 1196 (Fed.Cir.1995). Section 502 provides

that this court's review "shall be in accordance with chapter 7 of title 5" of the United States Code. Accordingly, this court reviews the agency's action to determine whether it was arbitrary, capricious, an abuse of discretion, or otherwise contrary to the law. 5 U.S.C. § 706(2)(A); *see LeFevre,* 66 F.3d at 1199.

The APA sets forth the following procedure for agency rule making:

(b) General notice of proposed rule making shall be published in the Federal Register.... The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

5 U.S.C. § 553. In brief, the APA requires publication of notice of proposed rulemaking in the Federal Register and an opportunity for interested persons to participate in the process through appropriate submissions. The agency must then consider "the record so made" in adopting a rule. *See United States v. Allegheny–Ludlum Steel Corp.,* 406 U.S. 742, 758, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

■ Under the section of the APA quoted above, agency decisions are entitled to considerable deference, and with respect to fact-finding, substantial evidence in the record is sufficient to support an agency's finding, even if a preponderance of the evidence may show otherwise. *See Federal–Mogul Corp. v. United States,* 63 F.3d 1572, 1579 (Fed.Cir.1995); 5 U.S.C. § 706 (1994).

■ To determine whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," this court examines whether the agency considered relevant factors or clearly erred in its judgment; this court will not, however, substitute its own judgment for the agency's. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on unrelated grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In informal rule-making cases such as this, courts often consider three questions: "(1) whether the rulemaking record supports whatever factual conclusions underlie the rule; (2) whether the policy determinations behind the rule are rational; and (3) whether the agency has adequately explained the basis for its conclusion." *See McGregor Printing Corp. v. Kemp* 20 F.3d 1188, 1193–94 (D.C.Cir. 1994).

## III.

■ MIC argues that the DVA "demonstrably closed its mind to public comment" by promulgating a final rule that was virtually identical to the interim final rule, even after comment had been received.

The APA does not expressly require agencies to keep an "open" mind, whatever such a subjective term might mean. Rather, § 553(c) requires agencies to afford interested persons an opportunity to participate in public rule making through submission of written data, views, or arguments. Section 553 requires consideration of whatever data and views are submitted. Such consideration has been considered to demonstrate an "open mind." *See Advocates for Highway & Auto Safety v. Federal Highway Admin.*, 28 F.3d 1288, 1293 (D.C.Cir.1994) ("A review of comments submitted and the responses made persuades us that the agency approached the post-promulgation comments with the requisite open mind").

The record shows that during the solicitation period, the agency received many relevant comments and considered them in the published final rule. The agency also considered, and responded to, proposals for alternative procedures. The agency considered and responded to comments questioning the need for reducing monthly payments on loans, comments decrying the thirty-day delinquency rule, comments questioning whether poor quality refinance loans were made under the prior rule, comments noting the effect of interest rates on default rates, comments suggesting a compromise sixty-day delinquency period, comments attacking a thirty-day delinquency rule, comments perceiving dangers to delinquent debtors, comments predicting an administrative overload under the new rule, and comments pointing out various specific problems borrowers might face. The agency also discussed in detail several comments by individuals, and suggestions for alternatives to the proposed rule. *See* 64 Fed.Reg. 19906–09.

DVA also complied with the APA in its consideration of letters it received during 1998 from two U.S. Congressmen. These letters asserted that the proposed rule change was "not in the veterans' best interest" and objected to the new DVA procedures. The letters further suggested that the rule change was contrary to the intent of Congress. In its response to these letters, DVA explained its reasons for seeking a change and quoted the House Committee report which accompanied the bill establishing the IRRRL program. The agency also discussed the points brought up in the letters in its publication of the final rule on April 23, 1999. These responses demonstrate that the DVA considered the views of these interested parties—which alone satisfies the APA.

In sum, the record shows that the agency received and considered relevant comments. This court, in light of the record, could "see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did." *State of South Carolina ex rel Tindal v. Block*, 717 F.2d 874, 886 (4th Cir.1983) (internal quotation marks and citations omitted). Therefore, the agency complied with the statutory requirements of the APA, including the requirement to consider whatever data and views were submitted.

## IV.

■ MIC asserts that DVA did not afford interested parties an opportunity to refute data about trends in IRRRL foreclosure rates, "which served as the impetus of the rule." MIC argues that DVA thus violated the APA's notice and comment provisions. For its part, DVA admits awareness of relevant statistics on foreclosure rates before it promulgated its final rule, but states that it did not "rely on" those statistics in promulgating the rule.

■ The APA requires notice of the "substance of the proposed rule" or a "description of the subjects or issues involved." 5 U.S.C. § 553. Title 5 does not, however, expressly require that interested parties receive notice of, and an opportunity to comment on, antecedent factual underpinnings for agency rule making. Our sister circuits have invalidated rule-making procedures for agency failure to disclose critical factual underpinnings for rule making, but the settings for those invali-

dations were different than that in this case. *See, e.g., National Black Media Coalition v. FCC,* 791 F.2d 1016 (2d Cir.1986) (FCC found to have acted arbitrarily for withholding technical data that justified a departure from minority preferences in apportionment of new AM broadcast licenses); *United States Lines, Inc. v. Federal Maritime Comm'n,* 584 F.2d 519 (D.C.Cir.1978) (FMC withheld data about shipping capacity from a shipping agreement). In the cited instances, the information withheld was so central to the decisional process that its nondisclosure was tantamount to refusing to describe the subject or issues in the rulemaking proceeding. In such rare instances, nondisclosure of the central "subjects or issues involved" in the rule making by withholding the data prompting the decisional change can offend the APA.

While DVA had access to statistics on foreclosure rates by year, the department performed no analyses based upon this data which can be said to have defined the subject or issue of its rule-making proceeding. DVA discerned a trend toward increasing foreclosure rates for loans in the IRRRL program. This trend may have been among the factors that suggested a review of the IRRRL program, but DVA did not rely upon it to define the issues the department associated with the program. The record shows that, in addition to discerning a trend, DVA undertook investigations into the legislative history of the program, the nature of advertising for IRRRL refinancing by certain loan providers, and the effect of the program on veterans. DVA set forth this process, and its results, in its notices of the proposed rule making. DVA ultimately collected a large number of comments on all of the premises for its action, and its ultimate decision was framed with adversarial comment in full view. DVA's public notice initially defined adequately the subjects and issues involved in its proposed new rule. The numbers that resulted in DVA's perception of a trend were not "key" to its decision-making, and therefore need not have been published with DVA's original notice. *Cf. National Assoc. of Utility Comm'rs v. FCC,* 737 F.2d 1095, 1121 (D.C.Cir.1984) ("An agency's denial of a fair opportunity to comment on a key study may fatally taint the agency's decisional process."). Therefore, DVA did not offend the APA by not publishing this data.

Moreover, the record does not show that DVA relied on any specific data, and particularly not the withheld data, in promulgating its rule. MIC points only to a single e-mail communication within DVA in which the author professes surprise and distress over elevated foreclosure rates on IRRRLs for the previous four years, as evidence that DVA relied heavily on the undisclosed data. The e-mail memo notes that the causes of this phenomenon "cannot be determined without additional research" and characterizes these statistics as a "cause for alarm." MIC says this communication shows that the annual foreclosure data was "critical to the decisional process." To the contrary, it is hard to conclude that a single intra-agency memo is evidence of agency-wide reliance on its content. Even if the memo shows some awareness of the trend data at the agency, it still does not show that the data rises to the level of defining the very subject and issue of the rule making. *See Conference of State Bank Supervisors v. Office of Thrift Supervision,* 792 F.Supp. 837, 843 (D.D.C.1992). In sum, DVA did not offend the APA by declining to disclose some information underlying its proposed rule.

## V.

■■■ In conclusion, DVA supplied an adequate record to support its rule change and its compliance with APA procedures. In an informal rule-making procedure such as this, the agency need only supply a record adequate to show compliance with APA requirements. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 547, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). An agency need not produce a full adjudicatory record. *See id.* at 548, 98 S.Ct. 1197. Moreover, if factual determi-

nations involved in an agency's decision are primarily of a judgmental or predictive nature, complete factual support in the record for an agency's judgment or prediction, based on the expert knowledge of the agency, is neither possible nor required. *See FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813–814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978). Therefore, this court finds the new rule to be not arbitrary and capricious, and DVA to have followed the APA's procedural requirements in adopting it.

### CONCLUSION

This court finds the Department of Veterans Affairs to not have acted arbitrarily or capriciously, and to have followed the APA's procedural requirements, in adopting the new rule, *Loan Guaranty: Requirements for Interest Rate Reduction Refinancing Loans*, RIN 2900–A192, 64 Fed.Reg. 19906 et seq., (Apr. 23, 1999).

### COSTS

Each party shall bear its own costs.

*DENIED.*