**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BEVERLY NEHMER; CLAUDE
WASHINGTON; LINDA
WAGENMAKERS; ROBERT FAZIO;
GEORGE CLAXTON; JULIO GONZALES;
PAUL R. JENSEN; WILLIAM MADDEN;
DAVID MAIER; BRUCE MILLER;
VIETNAM VETERANS OF AMERICA,
          *Plaintiffs-Appellees,*

        v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,
          *Defendant-Appellant.*

No. 06-15179

D.C. No.
CV-86-06160-TEH

---

BEVERLY NEHMER; CLAUDE
WASHINGTON; LINDA
WAGENMAKERS; ROBERT FAZIO;
GEORGE CLAXTON; JULIO GONZALES;
PAUL R. JENSEN; WILLIAM MADDEN;
DAVID MAIER; BRUCE MILLER;
VIETNAM VETERANS OF AMERICA,
          *Plaintiffs-Appellees,*

        v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,
          *Defendant-Appellant.*

No. 06-16164

D.C. No.
CV-86-06160-TEH

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, District Judge, Presiding

8731

Argued and Submitted
April 18, 2007—San Francisco, California

Filed July 19, 2007

Before: Stephen Reinhardt, John T. Noonan, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt

**COUNSEL**

Peter D. Keisler, Assistant Attorney General, William Kanter, Attorney, and John S. Koppel (argued), Attorney, Civil Division, United States Department of Justice, Washington, D.C., for the defendant-appellant.

Kevin V. Ryan, United States Attorney, San Francisco, California, for the defendant-appellant.

Barton F. Stichman (argued), National Veterans Legal Services Program, Washington, D.C., for the plaintiffs-appellees.

Linda S. Peterson and Laboni A. Hoq, Sidley Austin LLP, Los Angeles, California, for the plaintiffs-appellees.

---

**OPINION**

REINHARDT, Circuit Judge:

This case involves our government's treatment of its veterans who contracted serious ailments as a result of their exposure to Agent Orange in the course of the military's use of that toxic chemical as a defoliant during the Vietnam war. It is a disturbing story, and the performance of the United States Department of Veterans Affairs (VA) has contributed substantially to our sense of national shame.[1]

The issue before us on this occasion is a technical one. But it is symbolic of the problems that have plagued a significant group of veterans who deserve to receive our foremost care and attention. The present question is whether the District Court, in a clarification and enforcement order issued in 2005, reasonably interpreted the earlier court-approved Stipulation and Order (sometimes referred to as "Consent Decree") that settled a class action lawsuit brought by veterans of the Vietnam war (sometimes referred to as "plaintiff class" or "class plaintiffs").

---

[1]At the inception of this class action lawsuit in 1986, the defendant was the United States Veterans' Administration. In 1988, Congress redesignated the United States Veterans' Administration as the Department of Veterans Affairs, effective March 15, 1989. The Department of Veterans Affairs Act of 1988, Pub. L. No. 100-527, §§ 2 & 18, 102 Stat. 2635 (1988).

In 1989, the veterans successfully challenged a regulation of the VA that imposed an erroneous standard for determining which diseases were associated with dioxin. Congress thereupon enacted new legislation, the Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11 (1991), under which veterans who served in Vietnam and later suffer from such diseases receive a presumption that their ailments are connected to their exposure to Agent Orange in Vietnam. The dioxin-related diseases are deemed to be "service-connected," and the veterans qualify for disability benefits. The ensuing 1991 Stipulation and Order provides that as soon as the VA issues new determinations designating particular diseases as "service-connected," it must readjudicate the claims of veterans suffering from them if their previously filed claims were denied or are still pending, and must then pay them retroactive benefits. *Nehmer v. Veterans' Admin.*, 284 F.3d 1158, 1161-62 (9th Cir. 2002) (*Nehmer III*).

In 2003, the VA issued a regulation finding Chronic Lymphocytic Leukemia to be a disease that was associated with dioxin and thus "service-connected," but the VA did not readjudicate the prior claims of Vietnam veterans suffering from that ailment. Nor did it pay them retroactive benefits. The reason it offered for its failure to follow the provisions of the Consent Decree was that in its view the decree does not apply to diseases that it determines to be "service-connected" after September 30, 2002, the original sunset date of the Agent Orange Act of 1991. In 2004, the plaintiff class, disputing this interpretation, filed a motion that the district court construed as a motion for clarification and enforcement of the decree. In 2005, the district court rejected the VA's interpretation and granted the veterans' motion. Because we conclude that the district court's construction of the decree is not only reasonable but correct, and that our long-suffering veterans are presently entitled to the benefits at issue, we affirm.

## I.  Factual and Procedural Background

### A.  Agent Orange

"Agent Orange is a chemical defoliant used by the United States Armed Forces in Vietnam to clear dense jungle land during the war. It contains the toxic substance dioxin. Since its use, Agent Orange has been statistically linked with the occurrence of many diseases in those exposed, including prostate cancer. For more than fifteen years [now, for more than twenty years], veterans suffering from diseases they believe to have been caused by Agent Orange have struggled with the United States for compensation." *Nehmer III*, 284 F.3d at 1160 (citing *In Re Agent Orange Prod. Liab. Litig.*, 818 F.2d 194 (2d Cir. 1987); *Nehmer v. U.S. Veterans Admin.*, 712 F. Supp. 1404 (N.D. Cal. 1989) ("*Nehmer I*"); *Nehmer v. U.S. Veterans Admin.*, 32 F. Supp. 2d 1175 (N.D. Cal. 1999) ("*Nehmer II* ")).

### B.  The Dioxin Act and the Challenge to the VA Regulations Limiting the Number of Service-Connected Diseases

The class action of which these proceedings are a part was initially filed against the VA in 1986 by Vietnam veterans who challenged a VA regulation, 38 C.F.R. § 3.311, governing their eligibility for disability benefits based on diseases associated with exposure to Agent Orange. *Nehmer III*, 284 F.3d at 1160; *Nehmer I*, 712 F. Supp. at 1408-09. The veterans claimed that the regulation did not comply with the Veterans' Dioxin and Radiation Exposure Compensation Standards Act of 1984, Pub. L. No. 98-542, 98 Stat. 2725 (1984) ("Dioxin Act"). *Nehmer I*, 712 F. Supp. at 1408-09.

The Dioxin Act "dramatically alter[ed] the process governing [veterans'] Agent Orange disability claims." *Id.* at 1407. "Rather than have the VA determine in individual adjudicatory proceedings whether a particular veteran's claimed dis-

ease was caused by Agent Orange exposure, the Act authorize[d] the Administrator of the VA [ ] to conduct rulemaking to determine which diseases will be deemed service connected for all diseases claimed to be caused by Agent Orange exposure." *Id.* at 1407-08.

The regulation implementing the Dioxin Act provided that any veteran who served in Vietnam "shall be presumed to have been exposed to a herbicide containing dioxin while in Vietnam." 38 C.F.R. § 3.311a(b) (1988). But it also stated that only a single disease — chloracne — "is sufficient to establish service-connection for resulting disability." *Id.* § 3.311a(c); *see also id.* § 3.311a(d) (stating that there is not a "cause and effect relationship between dioxin exposure" and "Porphyria cutanea tarda," "Soft tissue sarcomas," and "[a]ny other disease" besides chloracne). The district court invalidated the regulation because, although Congress intended the VA to "predicate service connection upon a finding of a significant statistical association between dioxin exposure and various diseases," the VA had erroneously required proof that a causal relationship existed. *Nehmer I*, 712 F. Supp. at 1420, 1423. The district court also voided all adverse VA benefit decisions based on the invalid regulation. *Id.* at 1423.

## C.   The Agent Orange Act of 1991

After the district court invalidated the VA regulation, Congress enacted the Agent Orange Act of 1991, Pub. L. No. 102-4, 105 Stat. 11 (1991), 38 U.S.C. § 1116. The Agent Orange Act was originally codified at 38 U.S.C. § 316, but six months later Congress renumbered § 316 of title 38 as § 1116. *See* 38 U.S.C.A. § 1116 (2002); Department of Veterans Affairs Codification Act of 1991, Pub. L. No. 102-83, § 5(a), 105 Stat. 378 (1991). Because the relevant portion of the Consent Decree at issue in this action refers to 38 U.S.C. § 316(b), we will refer to § 316 and § 1116 interchangeably.

The Agent Orange Act requires the Secretary of the VA to conduct new rulemaking proceedings to determine which diseases are sufficiently associated with exposure to Agent Orange so that veterans with approved diseases receive a presumption of service-connection. 38 U.S.C. § 1116.[2] Section 1116(b) states that

> (1) Whenever the Secretary determines, on the basis of sound medical and scientific evidence, that a positive association exists between (A) the exposure of humans to an herbicide agent, and (B) the occurrence of a disease in humans, the Secretary shall prescribe regulations providing that a presumption of service connection is warranted for that disease for the purposes of this section.

> (2) In making determinations for the purpose of this subsection, the Secretary shall take into account (A) reports received by the Secretary from the National Academy of Sciences under section 3 of the Agent Orange Act of 1991, and (B) all other sound medical and scientific information and analyses available to the Secretary.

*Id.* § 1116(b).

To develop the scientific information upon which to base service-connected determinations, § 3 of the Agent Orange Act directed the Secretary "to enter into an agreement with the National Academy of Sciences for the Academy to perform the services covered by this section[,]" and under that

---

[2]For background regarding how the VA ordinarily processes veterans' disability claims, and how a presumption of "service-connected" provides an alternative route for proving entitlement to disability benefits, see Mark Brown, *Science for Judges IV: Agent Orange Revisited and Human Behavior Research: The Role of Science in Department of Veterans Affairs Disability Compensation Policies for Environmental and Occupational Illnesses and Injuries*, 13 J.L. & POL'Y 593, 593-99 (2005).

agreement the Academy was to "review and summarize the scientific evidence, and assess the strength thereof, concerning the association between exposure to [dioxin] . . . and each disease suspected to be associated with such exposure." Agent Orange Act, § 3(b)-(c). Moreover, the Academy was to submit its first report no later than 18 months after the enactment of the Agent Orange Act, and, thereafter submit "periodic written reports . . . at least once every two years (as measured from the date of the first report)." *Id.* § 3(g)(1)-(2).

Furthermore, under the Agent Orange Act, when the Secretary received a report from the Academy, he was required to determine within 60 days "whether a presumption of service connection is warranted for each disease covered by the report," and if he determined that a "presumption is warranted," he was required to issue proposed regulations within 60 days setting forth his determination and to issue final regulations within 90 days after proposing them. 38 U.S.C. § 1116(c)(1)(A), (c)(2).

Finally, § 2(a) of the Agent Orange Act, as originally enacted, set forth a sunset date for the operation of the provisions that required the Secretary to issue regulations designating service-connected diseases in response to the scientists' reports. 38 U.S.C. § 316(e), 38 U.S.C.A. § 1116(e) (1992) ("Subsections (b) through (d) shall cease to be effective 10 years after the first day of the fiscal year in which the [Academy] transmits to the Secretary the first report under section 3 of the Agent Orange Act of 1991."). Because § 2(a), codified as § 316(e) or § 1116(e), provided that its sunset date would be 10 years after the first day of the fiscal year in which the Academy transmitted its first report to the Secretary, and the first report was transmitted on July 27, 1993, the original effective sunset date was September 30, 2002.

### D. The Veterans Education and Benefits Expansion Act of 2001

Ten years after the passage of the Agent Orange Act, Congress enacted the Veterans Education and Benefits Expansion Act of 2001, Pub. L. No. 107-103, § 201, 115 Stat. 976 (2001) ("Benefits Expansion Act"), which, *inter alia*, amended the sunset date contained in 38 U.S.C. § 1116(e) and extended the Secretary's authority to issue regulations designating service-connected ailments for another thirteen years.[3] As a result, the provisions in 38 U.S.C. § 1116(b), (c) and (d) have remained in effect since 1991, and will continue to be effective until September 30, 2015, or until such other time as Congress shall establish, should it enact another extension. *See* 38 U.S.C.A. § 1116(e) (2006) ("Subsections (b) through (d) shall cease to be effective on September 30, 2015.").

### E. The Final Stipulation and Order Entered in 1991

Shortly after Congress enacted the Agent Orange Act on February 6, 1991, the VA and the plaintiff class signed a court-approved Stipulation and Order or Consent Decree. On May 17, 1991, the district court entered the decree, "setting forth VA's ongoing responsibilities for further rulemaking and disability payments to class members." *Nehmer III*, 284 F.3d at 1160.

Under Paragraph 1 of the decree, the Veterans' Advisory Committee on Environmental Hazards — which the Dioxin Act had created — would "complete its analysis as to whether the scientific or medical evidence reveals a connection between exposure to dioxin and diabetes, lung cancer and

---

[3]Section 201(d) of the Benefits Expansion Act of 2001 provided that "EXTENSION OF AUTHORITY TO PRESUME SERVICE-CONNECTION FOR ADDITIONAL DISEASES.—(1) Subsection (e) of such section is amended by striking '10 years' and all that follows through 'Agent Orange Act of 1991' and inserting 'on September 30, 2015'."

peripheral neuropathy . . . and convey its evaluations and any recommendations to the Secretary." Under Paragraph 2, after reviewing the Advisory Committee's analysis of these three diseases, the Secretary was to initiate rulemaking in order to determine whether they were service-connected, or alternatively to defer rulemaking if the information was insufficient.

Furthermore, Paragraphs 3 and 5 established the VA's obligation to readjudicate veterans' disability claims whenever the VA in the future finds new diseases to be service-connected under the procedures set forth in 38 U.S.C. § 316(b) (renumbered subsequently at 38 U.S.C. § 1116(b)), and to pay retroactive benefits based on the date that a veteran filed his claim or became disabled, whichever is later. Paragraph 3 provides that

> As soon as a final rule is issued service connecting, based on dioxin exposure, any . . . disease which may be service connected in the future pursuant to the Agent Orange Act of 1991, 38 U.S.C. § 316(b), the VA shall promptly thereafter readjudicate all claims for any such disease which were voided by the Court's Order of May 3, 1989, as well as adjudicate all similar claims filed subsequent to the Court's May 3, 1989 Order, without waiting for final rules to be issued on any other diseases.

*Nehmer III*, 284 F.3d at 1161. Paragraph 5 provides that

> For any . . . disease which may be service connected in the future pursuant to paragraph 3 above, as to any details of claims which were voided as a result of the Court's May 3, 1989 Order, the effective date for disability compensation or dependency and indemnity compensation ("DIC"), if the claim is allowed upon readjudication pursuant to paragraphs 3 and 4 above, will be the date the claim giving rise to the voided decision was filed . . . . For any claim for any

such disease which was not filed until after May 3, 1989, the effective date for beginning disability compensation or [dependency and indemnity compensation ("DIC")] will be the date the claim was filed or the date the claimant became disabled or death occurred, whichever is later.

*Id.*; Stipulation & Order 5. As a result of the VA's rulemaking, the agency has "found that a number of cancers are linked to Agent Orange using the appropriate standard, and, as a result, they have been accorded service connected status." *Nehmer II*, 32 F. Supp. 2d at 1177.

## F. A Prior Appeal Confirms the Retroactive Application of the Consent Decree

For the past sixteen years since he entered the Consent Decree, Judge Thelton Henderson has "enforced compliance with the Stip[ulation] & Order and adjudicated disputes concerning its interpretation." *Nehmer III*, 284 F.3d at 1160 (internal citations omitted). In 1998, several disputes arose between the VA and the veterans, which required Judge Henderson in the first instance and this court on appeal to interpret the language of the decree. *Nehmer II*, 32 F. Supp. 2d at 1177-78; *Nehmer III*, 284 F.3d at 1161. In 1996, the VA determined prostate cancer to be service-connected, thus reaching the opposite conclusion from the one it had reached when it adopted its 1994 regulations. The VA, however, contended that "it [wa]s not required to pay retroactive prostate cancer benefits (accruing, in most cases, back to the date of the veteran's first claim for such benefits) to any veteran suffering from prostate cancer whose earlier claim was denied under the valid 1994 regulations." *Nehmer III*, 284 F.3d at 1161. The district court rejected the VA's interpretation, holding that "the consent decree requires [the] VA to provide retroactive benefits to any class member who submitted a claim after May 3, 1989, based on a disease that is later [determined to be] service connected under the Agent Orange

Act." *Id.* It then granted the veterans' motion to enforce the Consent Decree. *Id.* We affirmed, because we held "the district court's interpretation of the consent decree to be reasonable." *Id.*

Specifically, we concluded that "[t]he plain language and remedial purpose of the Consent Decree indicate that VA agreed to pay retroactive benefits to all claimants whose claims were filed after 1989, if and when the disease from which they suffer is [determined to be] service connected under the Agent Orange Act." *Id.* at 1161-62. Accordingly, veterans who applied for benefits anytime after 1989, and whose claims had been denied were to receive a readjudication of those claims and retroactive benefits, if the VA subsequently determined the disease from which they suffered to be service-connected, "even if such veterans' claims were originally denied under valid regulations." *Id.* at 1161.

### G.  The VA Finds Chronic Lymphocytic Leukemia to be Service-Connected in 2003, But Fails to Readjudicate Claims or Pay Retroactive Benefits

On January 23, 2003, the National Academy of Sciences transmitted to the Secretary a report, "Veterans and Agent Orange: Update 2002." The report evaluated the scientific evidence regarding the association between herbicide exposure and Chronic Lymphocytic Leukemia (CLL), and found "sufficient evidence of an association." Disease Associated With Exposure to Certain Herbicide Agents: Chronic Lymphocytic Leukemia, 68 Fed. Reg. 14,567, 14,568 (Mar. 26, 2003). In response to the Academy's report, on March 26, 2003 the VA issued a proposed rule, which announced that "the Secretary has determined that there is a positive association between the exposure of humans to an herbicide agent and the occurrence of CLL in humans" and that "the Secretary has determined that a presumption of service connection for CLL is warranted pursuant to 38 U.S.C. [§] 1116(b)." *Id.* at 14,569.

On October 16, 2003, the VA issued a final rule determining Chronic Lymphocytic Leukemia to be service-connected. Disease Associated With Exposure to Certain Herbicide Agents: Chronic Lymphocytic Leukemia, 68 Fed. Reg. 59,540, 59540 (Oct. 16, 2003). In that final rule, however, the VA explained its view that the Consent Decree's requirement that the VA pay retroactive benefits when the VA establishes that a disease is service-connected does apply to benefits based on a disease for which the Secretary of Veterans Affairs establishes a presumption of service connection after September 30, 2002 [the original effective sunset date of the Agent Orange Act, 38 U.S.C. § 1116(e)]." *Id.* This part of the final rule echoed the VA's opinion expressed in a separate final rule issued earlier in 2003. *See* Effective Dates of Benefits for Disability or Death Caused By Herbicide Exposure; Disposition of Unpaid Benefits After Death of Beneficiary, 68 Fed. Reg. 50966, 50968-70 (Aug. 25, 2003) (to be codified at 38 C.F.R. § 3.816) (stating that the "VA's authority to issue regulatory presumptions of service connection expired on September 30, 2002," and specifically that the Consent Decree entered by Judge Henderson did not intend to incorporate subsequent changes in the law, namely the extension of the VA's authority to determine that diseases are service-connected under 38 U.S.C. § 1116(b), as set forth in the Benefits Expansion Act of 2001).[4]

After the VA determined that Chronic Lymphocytic Leukemia was service-connected, it failed to take any action to

---

[4]The regulation, as codified, describes its *purpose* as stating the "effective-date rules required by orders of a United States district court in the class action case of Nehmer v. United States Department of Veterans' Affairs, No. CV-86-6160 TEH (N.D. Cal.)." 38 C.F.R. § 3.816(a). The regulation provides that veterans who previously filed disability claims and are "entitled to disability compensation for a covered herbicide disease," may receive retroactive dates of award, but the regulation defines the term "covered herbicide disease" as "a disease for which the Secretary of Veterans Affairs has established a presumption of service connection before October 1, 2002." *Id.* § 3.816(b)(2), (c).

readjudicate the claims of veterans with that affliction, or to pay them retroactive benefits. In response, on June 4, 2004 the class plaintiffs filed a motion for an order to show cause "why [the VA] should not be held in contempt of the Court's 1991 Final Stipulation and Order" due to its refusal to readjudicate the pertinent disability claims and to pay retroactive benefits. In a December 20, 2004 order, the district court converted the motion for an order to show cause into a motion for clarification and enforcement of the Consent Decree, because "the essence of the current motion is a request that the Court interpret, clarify, or construct particular terms of the Stip[ulation] & Order." (noting that the "heading of plaintiffs argument is 'Plaintiffs Merely Seek to Enforce the Stipulated Order.' "). In the same December 20, 2004 order, the district court rejected the VA's contention that because 38 U.S.C. § 502 provides that the U.S. Court of Appeals for the Federal Circuit has exclusive jurisdiction to entertain direct challenges to VA regulations, it lacked subject matter jurisdiction to interpret the Consent Decree.

After receiving additional briefing, on December 1, 2005 the district court granted the motion for clarification and enforcement, holding that "the terms of the Stipulation and Order shall continue in effect until expiration of the Agent Orange Act as extended." The district court concluded that the plain language of the Consent Decree supported the veterans' view that the Consent Decree applies to diseases determined to be service-connected after, as well as before, September 30, 2002. It found compelling Paragraph 3's reference to 38 U.S.C. § 1116(b) of the Agent Orange Act, which requires the Secretary to issue regulations establishing service-connected diseases after receiving reports from the Academy, and its failure to refer to 38 U.S.C. § 1116(e), the sunset provision of that Act. Moreover, the district court explained that giving full effect to the Consent Decree's retroactive benefits provision furthers the remedial purpose of the Consent Decree that we had recognized in *Nehmer III*. 284 F.3d at 1162-62.

The VA filed a timely notice of appeal from the December 1, 2005 order, and subsequently sought a stay pending appeal. On April 28, 2006, the district court denied the VA's motion for a stay and also established a procedure for processing the claims of veterans with Chronic Lymphocytic Leukemia in accordance with the Consent Decree. On June 20, 2006, the VA filed a second notice of appeal from April 28, 2006 order, and subsequently filed a motion to consolidate the two appeals, which we granted on September 28, 2006.

## II. Standard of Review

"The existence of subject matter jurisdiction is a question of law reviewed de novo." *United States v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 836 (9th Cir. 2002). "This court reviews de novo a district court's interpretation of a consent decree . . . but will 'give deference to the district court's interpretation based on the court's extensive oversight of the decree from the commencement of the litigation to the current appeal.' A court of appeals will uphold a district court's 'reasonable' interpretation of a consent decree." *Nehmer III*, 284 F.3d at 1160 (quoting *Gates v. Gomez*, 60 F.3d 525, 530-31 (9th Cir. 1995)).

## III. Jurisdiction

Before we consider whether the district court reasonably interpreted the Consent Decree, we must examine our own subject matter jurisdiction over the underlying motion for clarification and the instant appeal. The VA contends that the district court did not have subject matter jurisdiction to entertain the plaintiff class's motion, because the motion challenges a VA regulation and 38 U.S.C. § 502 provides that such challenges may be brought only in the Federal Circuit. If the district court did not have subject matter jurisdiction over the motion for that reason, then neither do we, the VA

correctly argues. We reject the VA's contention that the district court lacked jurisdiction.[5]

[1] Ordinarily, when a district court incorporates the terms of a settlement agreement or a stipulation into an order, it retains subject matter jurisdiction to interpret and enforce the contents of that order. *Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998) (stating that although the "[e]nforcement of a settlement agreement . . . 'requires its own basis for jurisdiction' . . . a basis for jurisdiction may be furnished 'by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the

---

[5]We also reject the plaintiff class's argument that we lack appellate jurisdiction over the VA's appeals from the two orders of the district court. Although we do not have appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because neither order grants, continues, modifies, refuses or dissolves an injunction, *id.*; *United States v. Oakland Cannabis Buyers' Coop.*, 190 F.3d 1109, 1112 (9th Cir. 1999), *rev'd on other grounds by* 532 U.S. 483 (2001) (citing *Public Serv. Co. of Colo. v. Batt*, 67 F.3d 234, 236-37 (9th Cir. 1995)); *Batt*, 67 F.3d at 236-38 (citing *In re Complaint of Ingram Towing Co.*, 59 F.3d 513, 516 (5th Cir. 1995)); *Motorola, Inc. v. Computer Displays Int'l*, 739 F.2d 1149, 1155 (7th Cir. 1984); *cf. Cunningham v. David Special Commitment Ctr.*, 158 F.3d 1035, 1037 (9th Cir. 1998), we do have such jurisdiction pursuant to 28 U.S.C. § 1291, on the basis of the practical finality doctrine. *See Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152-53 (1964). The district court's order in this post-final judgment proceeding involves an unsettled issue of national significance, and also is marginally final given that the proceedings that remain pending before the court have little substance and will not affect the central issue of the meaning of the Consent Decree. In addition, the exercise of appellate jurisdiction furthers the policies underlying 28 U.S.C. § 1292(b) and the final judgment rule of § 1291, and prevents the harm to both the veterans and the VA that a delay in appellate review of the district court's clarification order in this now twenty-one year old case would likely cause. *See SEIU, Local 102 v. County of San Diego*, 60 F.3d 1346, 1349-50 (9th Cir. 1994) (citing *Gillespie*, 379 U.S. at 152-53); *Zucker v. Maxicare Health Plans*, 14 F.3d 477, 483-84 (9th Cir. 1994); *Wabol v. Villacrusis*, 958 F.2d 1450, 1454 (9th Cir. 1990); *So. Cal. Edison Co. v. Westinghouse Elec. Corp.* (*In re Subpoena Served on Cal. Pub. Utils. Comm'n*), 813 F.2d 1473, 1479-80 (9th Cir. 1987); *Stone v. Heckler*, 722 F.2d 464, 467-68 (9th Cir. 1983).

settlement agreement in the order.' ") (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378, 381 (1991)); *see also Sandpiper Vill. Condo. Ass'n v. La.-Pac. Corp.*, 428 F.3d 831, 841 (9th Cir. 2005) (citing *Flanagan*, 143 F.3d at 544).

Because Judge Henderson incorporated the terms of the Stipulation and Order into the order that he entered on May 17, 1991, he concededly retained jurisdiction to interpret and enforce the terms of the Stipulation and Order, and, therefore, he ordinarily would plainly have jurisdiction to consider the plaintiff class's motion for clarification and enforcement of the Stipulation and Order. *See Flanagan*, 143 F.3d at 544.

The VA accepts this "unexceptionable proposition" and "does not dispute that the district court retained jurisdiction to supervise implementation of the consent decree." The VA, however, rests its argument regarding subject matter jurisdiction on its contention that in light of the Federal Circuit's exclusive jurisdiction to entertain direct challenges to VA regulations under 38 U.S.C. § 502 the district court has been divested of its jurisdiction to interpret the Consent Decree, at least with respect to "service-connected" determinations made after September 30, 2002. Its argument is as follows: following the district court's issuance of the Consent Decree, the VA enacted a regulation which in effect declared that the decree did not intend to incorporate the terms of the Benefits Expansion Act amending the sunset date of the pertinent provision of the Agent Orange Act. 68 Fed. Reg. at 50968-70; 38 C.F.R. § 3.816. Any challenge to *that* regulation, must be brought in the Federal Circuit.

**[2]** 38 U.S.C. § 502 provides that "[a]n action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers . . . is subject to judicial review. Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit." On two prior occasions, we have addressed the scope of

§ 502. *See Preminger v. Principi*, 422 F.3d 815, 821 (9th Cir. 2005), and *Chinnock v. Turnage*, 995 F.2d 889, 893 (9th Cir. 1993). In *Preminger*, we explained that

> Section 502 gives the Federal Circuit exclusive jurisdiction to review challenges to most actions by the Secretary of Veterans' Affairs. In particular, § 502 applies to (1) actions that require publication in the Federal Register, such as rules of procedure, substantive rules of general applicability, statements of general policy, and amendments, revisions, or repeals to those actions, under 5 U.S.C. § 552(a)(1); and (2) agency rulemaking, under 5 U.S.C. § 553. Thus, Congress explicitly has provided for judicial review of direct challenges to VA rules and regulations only in the Federal Circuit. . . . Accordingly, any direct challenge to [a regulation's] validity must be brought in the Federal Circuit.

*Id.* at 821 (emphasis added). In *Preminger*, we drew a distinction between facial challenges to VA regulations, which are subject to exclusive judicial review in the Federal Circuit, and as-applied challenges, which are subject to appellate review in this court, and we exercised our appellate jurisdiction over an as-applied challenge brought in a district court to a VA regulation that banned partisan activity on the VA's property. *Id.*

The VA contends that the veterans' motion for clarification and enforcement is a facial challenge to 38 C.F.R. § 3.816, the regulation adopted by the VA in a final rule on August 25, 2003, 68 Fed. Reg. at 50968-70, as well as to the VA's final rule that determined Chronic Lymphocytic Leukemia to be service-connected. 68 Fed. Reg. at 59540. Section 3.816 purports to set forth the "rules required by orders of" Judge Henderson in this case, 38 C.F.R. § 3.816(a), while the final rule determining Chronic Lymphocytic Leukemia to be service-connected contains the VA's argument as to why it believes that the Consent Decree should not be interpreted to require

the payment of retroactive benefit payments to veterans with that disease: the service-connected determination was made after September 30, 2002, the original sunset date for the Agent Orange Act provision. The VA also argues that the motion is not an as-applied challenge to the regulations, a contention with which the plaintiff class agrees.

The plaintiff class argues in opposition that its motion for clarification and enforcement of the Consent Decree does not fall within the exclusive jurisdiction of 38 U.S.C. § 502 because the motion does not directly challenge either the merits of the VA's regulation or the VA's rulemaking authority. *See Preminger*, 422 F.3d at 821 ("Congress explicitly has provided for judicial review of *direct challenges* to VA rules and regulations only in the Federal Circuit.") (emphasis added). Nor, according to the veterans, does the motion urge the district court — or this court — to invalidate the regulations. Instead, they assert that the motion challenges the *actions* of the VA in failing to comply with the terms of the Consent Decree — irrespective of the existence of the VA regulations — given that in October 2003 the VA determined that Chronic Lymphocytic Leukemia was service-connected but then failed to take the *actions* of readjudicating past claims and paying retroactive benefits, which are explicitly mandated by Paragraphs 3 and 5 of the decree.

**[3]** We agree with the veterans that their motion does not directly challenge the VA regulations. As the district court concluded, in addressing the motion for clarification and enforcement, it is only "the Stip[ulation] & Order that must be interpreted" to determine whether the plain language of Paragraphs 3 and 5 applies to the claims of veterans suffering from Chronic Lymphocytic Leukemia. Because the district court was neither asked nor required to engage in judicial review of the VA regulations in order to clarify the terms of the Consent Decree, 38 U.S.C. § 502 does not divest it of subject matter jurisdiction.

Notably, the plaintiff class's motion that gave rise to this appeal solely challenged the VA's non-regulatory failure to act, and not the VA's regulations themselves. The motion stated that the VA had "failed" to follow Paragraph 3 because "[i]t has not identified and readjudicated CLL claims that were denied between September 25, 1985 and May 3, 1989 [the date of the district court's order in *Nehmer I*], or CLL claims that were pending or filed between May 3, 1989 and the date of the CLL regulation[,]" and for "CLL claims that were pending on the date of the CLL regulation and thereafter granted, the VA has wrongfully assigned the publication date of the CLL regulation as the effective date instead of the date the CLL claim was filed, as required by paragraph 5 of the Consent Decree." Moreover, the veterans made clear in their brief in support of the motion that they "merely seek to enforce the stipulated order" and ask only for an order requiring the VA to follow the terms of Paragraphs 3 and 5, and to permit discovery in order to identify which class members had been denied compensation under the decree.

In granting the motion, the district court confirmed that the veterans' motion was "based on [the VA's] refusal to pay retroactive benefits to veterans whose diseases have been deemed 'service connected' after the original sunset date of the Agent Orange Act in 2002." As the district court had previously concluded in its jurisdictional order, the "essence of the current motion is a request that the Court interpret, clarify, or construct particular terms of the Stip[ulation] and Order," and not a request to review or invalidate a VA regulation. Moreover, when the VA briefed the merits regarding the interpretation of the Consent Decree in the district court, the VA did not argue that that court — or any other court — would be bound by the VA's own interpretation of the decree espoused in its regulations. Instead, the VA's argument relied on the "plain language" of the decree and additional extrinsic evidence, again suggesting that the district court was not called upon to engage in judicial review of a VA regulation. Still, even if the VA had raised the existence of the regula-

tions as a defense to the veterans' motion for clarification, the assertion of that defense would not convert the veterans' motion to a direct facial challenge to VA regulations.

Furthermore, even if we were to construe the plaintiff class's motion as a direct facial challenge to the VA regulations, we still could not accept the VA's argument that 38 U.S.C. § 502 divests the district court of its continuing jurisdiction to interpret and enforce its decree. As the district court correctly concluded, the statements in the VA regulations expressing the VA's view of the meaning of the Consent Decree that it entered into many years earlier does not constitute an exercise of the agency's rulemaking function referred to in § 502, but rather of a function more akin to adjudication. Indeed, to put it more accurately, the VA's expression of its position in a contested judicial matter is more like the function of advocacy, undertaken when the agency is a party to litigation, rather than of adjudication. Under such circumstances, the VA's statement of its views does not fall within the scope of § 502. *Cf. LeFevre v. Sec'y, Dep't of Veterans Affairs*, 66 F.3d 1191, 1196 (Fed. Cir. 1995) (stating that under § 502 the Federal Circuit may review "substantive rules of general applicability, statements of general policy and interpretations of general applicability because these are all actions to which section 552(a)(1) refers," and that "rule making is legislative in nature, is primarily concerned with policy considerations for the future rather than the evaluation of past conduct, and looks not to the evidentiary facts but to policy-making conclusions to be drawn from the facts.") (citations and internal quotations omitted); *Griffin v. Dep't of Veterans Affairs*, 129 F. Supp. 2d 832, 838 (D. Md. 2001) (quoting *LeFevre*, 66 F.3d at 1196).

The gravamen of the 2003 VA regulations is a legal argument that the 1991 Consent Decree — at its inception and based on its language and surrounding circumstances — did not intend to mandate readjudication or retroactive benefit payments for claims based on diseases that the VA determines

to be service-connected after the original sunset date of the Agent Orange Act, 38 U.S.C. § 1116(e), September 30, 2002. The VA's analysis in the regulations almost entirely relies upon the application of generally applicable contract law principles to the then-twelve year-old Consent Decree, *see* 68 Fed. Reg. at 50968-70; Effective Dates of Benefits for Disability or Death Caused by Herbicide Exposure; Disposition of Unpaid Benefits After Death of Beneficiary, 68 Fed. Reg. 4132, 4138-39 (Jan. 28, 2003), and, thus, the VA engaged in the same exercise of interpretation of the court's decree in which the court itself subsequently engaged when issuing the order from which the VA now appeals. *See* 68 Fed. Reg. at 4139 (stating that the "stipulation and order must be interpreted in accordance with general principles of contract law," that "unless the parties provide otherwise, a contract is presumed to incorporate the law that existed at the time the contract was made," and that any regulation service-connecting diseases after September 30, 2002 "are beyond the *express scope* of the Nehmer stipulation and order") (emphasis added). This is a function for the court to perform, not the party appearing before it, even an administrative agency. The VA's retrospective evaluation of past conduct, including an analysis of twelve-year-old evidentiary facts, does not constitute rulemaking, the review of which Congress placed in the exclusive province of the Federal Circuit. *See LeFevre*, 66 F.3d at 1196. In sum, even if the motion for clarification and enforcement constituted a direct challenge to the VA regulations, we would hold that because the regulations do not contain substantive rules, statements or interpretations of general applicability, they fall outside the scope of 38 U.S.C. § 502. *Id.* (citing 5 U.S.C. § 551(4) (defining the term "rule" under the Administrative Procedure Act)).[6]

---

[6]The VA's reliance on *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186 (7th Cir. 1986) (*O'Hare II*) and *Suburban O'Hare Comm'm v. Dole*, 603 F. Supp. 1013 (1985) (*O'Hare I*) is misplaced. The actions which gave rise to those judicial determinations involved a different jurisdictional statute, 49 U.S.C. § 1486(a), which required judicial review of

Finally, the VA cannot usurp the power of a district court to construe the provisions of an order it has issued or divest that court of its authority and transfer it to the Federal Circuit simply by issuing a regulation interpreting that order or declining to follow it. It is well established that the district court has the inherent authority to enforce compliance with a consent decree that it has entered in an order, to hold parties in contempt for violating the terms therein, and to modify a decree. *See Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 381 & n.6 (1992); *Spallone v. United States*, 493 U.S. 265, 276 (1990); *Holland v. New Jersey Dept. of Corr.*, 246 F.3d 267, 270-71, 281-82 (3rd Cir. 2001); *Stone v. City and County of S.F.*, 968 F.2d 850, 856 (9th Cir. 1992); *Keith v. Volpe*, 784 F.2d 1457, 1461 (9th Cir. 1986); *see also* Fed. R. Civ. P. 60(b)(5); *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."). That the district court preserves such inherent authority presupposes that it, and not a party before it, is the principal and proper arbiter with the responsibility to interpret the decree and oversee the litigation. Although a party may *ask* the district court to issue an order clarifying, enforcing, or modifying a decree and *suggest* a favored interpretation, a party — whether a private or public entity — cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the

---

"[a]ny order" of the Federal Aviation Administration to be brought in the federal courts of appeals, as opposed to 38 U.S.C. § 502, which applies only to rulemaking and rules of general policy. In the *O'Hare* cases there was no doubt that the FAA had issued an order that was subject to the jurisdictional statute. Furthermore, unlike in the instant case, *O'Hare I* and *II* involved a direct challenge to the agency's order. Finally, those cases did not involve an attempt by an agency to issue an order or regulation purporting to usurp the inherent authority of a court to construe its own decree — to interpret a decree that it had entered many years earlier, about which it had extensive knowledge from years of oversight. An executive agency possesses no such power to strip a federal court of its jurisdiction.

district court's approval. Furthermore, the importance of the district court's role in interpreting a consent decree is further evidenced by the discretion that we afford district courts in reviewing their interpretations, particularly when the district court has overseen a remedial decree for many years. *See Nehmer III*, 284 F.3d at 1160 (quoting *Gates*, 60 F.3d at 530-31); *Stone*, 968 F.2d at 856.

In this case, the VA urges us to hold that an executive agency that has been ordered by a district court to take various actions in order to comply with the law can remove itself from that court's authority and ignore its orders simply by enshrining its interpretation of a consent decree in a regulation which only an appeals court in another circuit may review. But the substantive effect of such a holding would be to give the VA the right to unilaterally withdraw the jurisdiction of the district court and of this circuit. While Congress has the power under Article III of the U.S. Constitution to define the jurisdiction of the lower federal courts, *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1440 (9th Cir. 1997), an executive agency does not have that same authority. We are unwilling to read 38 U.S.C. § 502 as granting to the VA the power to unilaterally eliminate jurisdiction of a district court, to forfeit that court's right to supervise and implement its own equitable orders, and to redirect what is effectively a motion to vacate an injunction from a district court to a court of appeals in another circuit. Finally, the VA's proffered interpretation of § 502 would raise a most troubling question of separation of powers under the Constitution, a question that, because the VA's argument fails for so many other reasons, we need not definitively answer today.

## IV.  Discussion

On the merits, this appeal presents a single question regarding the interpretation of the Consent Decree: whether Paragraphs 3 and 5 require the VA to readjudicate the previously filed claims of veterans who suffer from diseases that are

determined to be service-connected, pursuant to 38 U.S.C. § 1116(b), and to make retroactive payments to those veterans, in instances in which the determination is made subsequent to September 30, 2002. The district court answered this question in the affirmative, on the basis of the plain language of the decree. In view of Judge Henderson's longstanding, extensive and diligent oversight of the *Nehmer* Consent Decree, we must affirm his interpretation of the decree so long as it is reasonable. *Nehmer III*, 284 F.3d at 1160 (citing *Gates v. Gomez*, 60 F.3d 525, 530-31 (9th Cir. 1995)). Because we conclude that Judge Henderson's interpretation is not only reasonable but correct, we affirm.

**[4]** "A consent decree, which has attributes of a contract and a judicial act, is construed with reference to ordinary contract principles." *City of Las Vegas v. Clark County*, 755 F.2d 697, 702 (9th Cir. 1985) (citing *Washington v. Penwell*, 700 F.2d 570, 573 (9th Cir. 1983)); *see also United States v. Asarco Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) ("[C]ourts treat consent decrees as contracts for enforcement purposes."). "A consent decree, like a contract, must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree." *Asarco*, 430 F.3d at 980. Therefore, if the plain language of a consent decree is clear, we need not evaluate any extrinsic evidence to ascertain the true intent of the parties. *Id.* at 980-81 (discussing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 239 (1985), and *United States v. Armour*, 402 U.S. 673 (1971)); *Molski v. Gleich*, 318 F.3d 937, 946 (9th Cir. 2003); *Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994); *S.F. NAACP v. S.F. Unified Sch. Dist.*, 896 F.3d 412, 414 (9th Cir. 1990). As we explained in *Molski*, it is "particularly appropriate in class action litigation" to resolve the meaning of a consent decree based on its plain language, if possible, "because a member of the class who was not present at any negotiations would be at a disadvantage in presenting extrinsic evidence of the meaning of the consent decree." 318 F.3d at 946.

**[5]** Turning to the plain language of the Stipulation and Order, the language that bears on the question whether the VA must readjudicate previously filed claims for diseases service-connected after 2002 is found in Paragraph 3, which states that

> As soon as a final rule is issued service connecting, based on dioxin exposure, *any . . . disease which may be service connected in the future pursuant to the Agent Orange Act of 1991, 38 U.S.C. § 316(b)*, the VA shall promptly thereafter readjudicate all claims for any such disease . . . .

*Nehmer III*, 284 F.3d at 1161 (emphasis added). As discussed above, § 316(b) requires the Secretary to issue regulations "providing that a presumption of service connection is warranted for [a particular] disease" whenever he determines that there is a positive association between exposure of humans to dioxin and the occurrence of that disease. 38 U.S.C. § 316(b) (renumbered at 38 U.S.C. § 1116(b)). There can be no doubt that § 316(b) is still in effect and that the VA is still required by that provision to make determinations of service-connectedness.

The VA contends, however, that the reference to § 316(b) in Paragraph 3 demonstrates the intent of the parties to place a temporal limit on the life of the Consent Decree, measured by the time period contained in § 316(e), and that even though § 316(b) remains in effect, the requirements of the Consent Decree do not. At the time the decree was entered, the VA asserts, the parties understood that § 316(b) would expire in about 11 or 12 years, and the decree therefore does not contemplate incorporating future changes to § 316, including any extension by Congress of the period in which that provision remains in effect.

The district court, relying on the plain language of Paragraph 3 — "any . . . disease which may be service connected

in the future pursuant to the Agent Orange Act of 1991, 38
U.S.C. § 316(b)" — rejected the VA's argument. It explained
that

> the Stipulation and Order contains no hard deadline.
> Instead, it mandates retroactive payment for all dis-
> eases that may be service connected "in the future."
> Stip[ulation] & Order 3. The agreement contains no
> other provision regarding its temporal longevity; it
> does not cite the 10 year sunset provision of the
> AOA (38 U.S.C. § 316(e)), nor does it incorporate
> the provision by reference.

Next, acknowledging that each party contends that its own
position is the only possible one in light of the plain language,
the district court concluded that

> [t]he court finds that plaintiffs are correct and defen-
> dants are wrong. The plain terms of Paragraph 3 of
> the Stip[ulation] & Order obligate defendants to con-
> tinue making retroactive payments for any and all
> diseases that are deemed service connected pursuant
> to the Agent Orange Act [AOA]. Defendants' obli-
> gations are plainly tied to the life of section 1116(b)
> of the AOA, as the explicit terms of the Stip[ulation]
> & Order provide. As long as section 1116(b) is in
> effect, the Stip[ulation] & Order applies. Due to the
> passage of the Benefits and Expansion Act [of
> 2001], section 1116(b) lives on, and so, therefore,
> does the Stip[ulation] & Order.

The district court's interpretation of the plain language of
Paragraph 3 is not only reasonable, it is also the only correct
interpretation. First, the phrase "any . . . disease which may
be service connected in the future pursuant to the Agent
Orange Act of 1991, 38 U.S.C. § 316(b)," plainly refers to the
designation of any disease made by the VA pursuant to the
Agent Orange Act, without any time limitation. The Consent

Decree has no deadline and contains no temporal language other than the broad and open-ended phrase "in the future." Moreover, Paragraph 3 refers to the provisions of § 316(b) of that Act, not to the sunset language contained in subsection (e). If Paragraph 3 had referred to § 316 generally, the VA's argument that the parties intended to limit the life of the decree to the period prescribed by the sunset provision in subsection (e) might have been colorable (although we would not have agreed with it), but the Consent Decree made no such general reference.

**[6]** Most important, the terms of subsection (b) to which the Consent Decree refers have remained the same since the inception of the decree. The change to the sunset clause in subsection (e), made in 2001, resulted in no modification to the language of subsection (b). The subsection (b) in force when the Consent Decree was issued, and the subsection (b) to which the decree refers, is the identical subsection (b) on which the VA based its actions when it determined Chronic Lymphocytic Leukemia to be service-connected in 2003. The pertinent provision did not change, and the VA's obligations under Paragraph 3 remained the same in 2004 as they were on the day the decree first was entered. In sum, we agree with the district court that the Consent Decree is plain on its face: the VA must reconsider the previous denial of a claim of a veteran suffering from a disease determined by the VA to be service-connected regardless of when the determination is made, so long as that determination is made pursuant to 38 U.S.C. § 1116(b).[7]

---

[7]To resolve what it sees as an ambiguity in the decree, the VA argues that in the absence of a federal common law rule on point, we should apply California contract law to interpret the Consent Decree — a contract to which the federal government is a party — and that under California law the Consent Decree does not adequately express an intent to incorporate a subsequent change in federal law, namely the extension of the sunset date contained in § 316(e) under the Benefits Expansion Act of 2001. Even were we to accept the VA's suggestion that we look to California

Because the district court's interpretation is compelled by the clear language of the Consent Decree, we do not consider any extrinsic evidence. *Asarco*, 430 F.3d at 980; *Molski*, 318 F.3d at 946; *Gates*, 39 F.3d at 1444. Even if we were to do so, however, the extrinsic evidence would not cause us to reject the district court's interpretation. In fact, the surrounding circumstances cut more in favor of the veterans' position than the VA's. The VA's contention that the parties did not include an express deadline in the Consent Decree because they could not identify the exact date referred to in 38 U.S.C. § 316(e), given that the National Academy of Sciences had not yet filed its first report, is unpersuasive. If the parties had in fact harbored a concern that a fixed deadline would not properly account for § 316(e)'s inchoate date, the parties could easily have incorporated the language of § 316(e) into the Consent Decree, could have expressly referred to § 316(e), or could have set a finite date of September 30,

law, and even if the language of § 316(b) itself had been amended, rather than a different provision of the Agent Orange Act, the VA's reliance on California law would not aid its cause. Under California law, Paragraph 3 of the Consent Decree requires the incorporation of a subsequently passed law because it refers expressly to 38 U.S.C. § 316(b), a particular statutory provision. *See Torrance v. Workers' Comp. Appeals Bd.*, 32 Cal. 3d 371, 378-79 (1982) (stating that when a contractual "instrument provides that it shall be enforced according either to the law generally or to the terms of a particular . . . statute, the provision must be interpreted as meaning the law or the statute in the form in which it exists at the time of such enforcement" and holding that an agreement in which a state fund agreed, on behalf of a city, "to pay promptly and directly to any person entitled thereto under the Work[ers'] Compensation Laws" incorporated future changes to those laws) (quoting 14 Cal. Jur. 3d, Contracts, § 173)); *accord Jones-Hamilton Co. v. Kop-Coat, Inc.*, 750 F. Supp. 1022, 1028 (N.D. Cal. 1990), *aff'd by* 973 F.3d 688 (9th Cir. 1992). Moreover, contrary to the VA's suggestion that this principle of California law applies only to procedural statutes, the *Torrance* court applied the principle — *i.e.*, that a contract's reference to the terms of a particular statutory provision incorporates subsequent statutory changes to that law — to the workers' compensation law as amended by subsequent changes that affected the substantive obligations of the parties. 32 Cal.3d at 377-79.

2002, the latest possible sunset date under § 316(e); but they chose none of these reasonable options. The VA's contention is far less plausible than the veterans' argument that the parties intentionally left the door open for the likely possibility that Congress would extend § 316(b) by amending § 316(e), because they were aware that Congress often re-authorizes or extends similar popular programs that provide benefits to our nation's veterans.[8]

[7] Finally, because the district court reasonably interpreted Paragraph 3 of the Consent Decree to require readjudication of prior claims, it also correctly concluded that, under Paragraph 5, retroactive benefit payments are owed on such claims. *See* Stipulation and Order 5 (stating that "[f]or any . . . disease which may be service connected in the future pursuant to paragraph 3 above," the VA is required to set an effective date for benefits based on the date the claim was filed or the "date the claimant became disabled or death occurred").

---

[8]The VA seeks to rely on a statement in one of our earlier opinions regarding the expiration date of the provision in question. Apparently unaware of the fact that Congress had extended the Agent Orange Act in December 2001, perhaps because the parties had filed all of their appellate briefs by August 2001, we cited a statement the district court made in 1999 that " 'the Stip[ulation] & Order is not therefore boundless. The [Agent Orange] Act expires in 2003. *See* 38 U.S.C. § 1116(e). The retroactive benefit provisions of the Stip[ulation] & Order are expressly tied to the Act so that initial claims filed after 2003 will fall outside the scope of the Stip[ulation] & Order.' " *Nehmer III*, 284 F.3d at 1162. However, as Judge Henderson explained in granting the plaintiff class's motion for clarification in 2005, when he made the statement in 1999 that we cited in *Nehmer III*, it was his "expectation that the [Agent Orange] Act as it appeared at that time would expire in late 2002," and "since the Act had not been extended at that point, it made sense to assume that expiration would occur as originally stated in the Act." This expectation did "not mean that the parties or the courts incorporated that date as a hard and fast condition of the Stip[ulation] & Order. Rather, this expectation was simply a reflection that the Stip[ulation] & Order follows the life of the [Agent Orange Act]; since the Act had not been extended at that point, it made sense to assume that expiration would occur as originally stated in the Act." We find this explanation persuasive and consistent with the district court's well-reasoned interpretation of Paragraph 3 in the instant dispute.

## V. Conclusion

Because the district court not only reasonably but correctly interpreted its Consent Decree, we affirm the December 2005 order granting the veterans' motion for clarification and enforcement, as well as the April 2006 order establishing a procedure for processing the veterans' claims.

The answer to the legal question on this appeal is quite apparent. The Department of Veterans Affairs is obligated by law to pay disability benefits to the veterans who are suffering from Chronic Lymphocytic Leukemia as a result of their exposure to Agent Orange, a noxious chemical widely used by our government in the course of the Vietnam war. Three different Congresses in three different decades have enacted legislation signed by three different presidents, designed to ensure the payment of such benefits to veterans afflicted with Agent Orange-related ailments. What is difficult for us to comprehend is why the Department of Veterans Affairs, having entered into a settlement agreement and agreed to a consent order some 16 years ago, continues to resist its implementation so vigorously, as well as to resist equally vigorously the payment of desperately needed benefits to Vietnam war veterans who fought for their country and suffered grievous injury as a result of our government's own conduct. Whether the Vietnam war was just or not, whether one favored or opposed it, one thing is clear. Those young Americans who risked their lives in their country's service and are even today suffering greatly as a result are deserving of better treatment from the Department of Veterans Affairs than they are currently receiving. We would hope that this litigation will now end, that our government will now respect the legal obligations it undertook in the Consent Decree some 16 years ago, that obstructionist bureaucratic opposition will now cease, and that our veterans will finally receive the benefits to which they are morally and legally entitled.

AFFIRMED.